**TEXAS CO. et al. v. XAVIER et al.**

Civil Action No. 1029.

District Court, E. D. South Carolina, Charleston Division.

Feb. 18, 1944.

Legge & Gibbs, of Charleston, S. C., for plaintiffs.

Robert Mc. Figg, Jr., of Charleston, S. C., for defendant Mary Mercer Xavier.

Hagood, Rivers & Young, of Charleston, for defendant Ella B. Xavier.

WARING, District Judge.

This case was instituted by The Texas Company and Richard L. Saunders as Trustee, by a bill of interpleader as authorized by Title 28 U.S.C.A. § 41 (26), and relates to the disposition of certain interests and rights in a number of shares of the capital stock of the plaintiff, The Texas Company. One of the defendants is Mary Mercer Xavier (also known as Mary E. Xavier), who is the divorced wife of Norman F. Xavier. The other defendant is Ella B. Xavier, the widow of Norman F. Xavier, who is made a party both individually and as administratrix. The Bill of Complaint sets forth that The Texas Company is a corporation under the laws of the State of Delaware and it appears that Norman F. Xavier was an employee of such company and/or of its predecessors and subsidiaries. The plaintiff, Saunders, is an official of The Texas Company and a Trustee vested with certain duties and rights relative to stock subscriptions as hereinafter set forth. Some of the matters herein set forth occurred before and some since the incorporation of the present The Texas Company so that certain of the stock subscriptions and obligations were with certain of its subsidiaries or predecessors. However, all of such matters are now assumed by The Texas Company and for the purpose of convenience no further reference or attempt to differentiate will be made between these various companies since all rights in this matter are in relation to stock of The Texas Company and funds in the hands of it or of the Trustee.

Norman F. Xavier entered the employ of The Texas Company (or a subsidiary), hereinafter referred to as the "Company", in April 1918, and continued in such employ until the time of his death May 18, 1938. The Company inaugurated a plan whereby its employees were permitted to purchase capital stock of the Company and pay for same in monthly installments under certain terms and conditions. On July 1, 1928, Xavier subscribed to twenty shares and subsequently to another twenty shares and subsequently to nineteen more shares. The plan and method of subscription were practically the same excepting that the prices for the shares of stock and the amounts of installment payments to be made were slightly different. These may be set forth in formal Findings of Fact, but for the purpose of this opinion are unimportant. Un-

der the plan of purchase the Trustee was permitted to subscribe for additional shares according to a certain ratio with the amounts already subscribed for an employee, and as a result there were subscribed for Xavier thirteen additional shares. It appears that three of these shares were subscribed for prior to the last subscription directly subscribed for by him and the other ten shares were subscribed for later, some time in 1937. Under the plan of subscription (which for the purpose of thi· case was the same in all of the various sub·scriptions and allotments), the stock was subscribed for and held by a Trustee who had full power to vote it and hold it until fully paid for by the employee. Upon the death of an employee, his estate or a bene-·ficiary if he designated one, became entitled to receive the stock upon paying such balance that might be due, or at the election of the estate or such beneficiary, became entitled to receive the full amount of money which had been actually paid in by the employee, together with interest. On the first stock subscription of twenty shares no beneficiary was designated, but on the second and third subscriptions the then wife of Xavier, namely, Mary Mercer Xavier, hereinafter referred to as "Mary", was named. This designation named her as beneficiary for the stock then allotted "and all stock heretofore allotted to me and held by the Trustee in my name". It thus appears that the fifty nine shares were included in this designation. The three shares subscribed by the Trustee hereinabove referred to must be placed in the same category since their subscription was prior to the last of the abovenamed. The other ten shares were subscribed for by the Trustee subsequent to the subscription in 1930, and contain no designation.

It appears that Xavier and his wife, Mary, agreed to separate and later severed the bonds of matrimony. They were then living in China where he had been sent by the Company and they entered into an agreement dated November 2, 1932. It appears from the affidavit of Cornell S Franklin, an attorney in Shanghai, China, that he was instructed by Mary "to prepare a property settlement agreement for her signature and that of her husband", and that he prepared the same and that it was executed by the two parties. The terms of this agreement or settlement are as fol-'ows:

"Property Settlement

"This Agreement made and entered into at Shanghai, China, this 2nd day of November 1932 by and between Norman Fredrick Xavier (hereinafter called the 'Husband') and Mary Mercer Xavier (hereinafter called the 'Wife').

"Witnesseth:

"That, Whereas as a result of disputes, differences and disagreements said Husband and Wife have separated and are now living separate and apart; and

"Whereas the Husband desires to make provision for the future maintenance and support of the wife; and

"Whereas the parties desire further to forever settle the question of community property between them as well as all other property rights;

"Now, therefore, in settlement, adjust-·ment and in compromise of all property questions and rights the Husband agrees to pay to the Wife the sum of Five Hundred Dollars ($500) United States currency upon the execution of this document to defray her travelling expenses from China to her home in the United States and the further sum of Two Hundred Dollars ($200) United States currency also upon the execution of this document for her maintenance and support and the further and additional sum of One Hundred and Fifty Dollars ($150) United States currency on the first day of December 1932 and a like sum on the first day of each and every month thereafter for her maintenance and support, which said sums the Wife agrees to accept in full settlement and satisfaction of all claims, rights and duties arising out of the marital relation and/or in connection with the community property of the parties hereto; and in consideration thereof the Wife does hereby agree to release and discharge the Husband from all such claims and does hereby agree to release all of her interest in or her right or claim to the separate estate of the Husband. Said parties mutually agree that each may freely sell or otherwise dispose of his or her own property by gift, deed, or will and each party is hereby barred from any and all rights or claims by way of dower, courtesy, inheritance, de-·scent, distribution or any rights that may arise out of said property and each party releases and relinquishes to the other and to the heirs, executors, administrators and assigns thereof all claims of dower or in-

heritance in and to all real property of the other whether now owned or hereafter acquired.

"In consideration of the foregoing it is further agreed that each party hereto will upon the request of the other execute and acknowledge any and all deeds and instruments of release or conveyance in order to enable such other to sell, convey or otherwise dispose of his or her own real property free from any right or interest therein apparent or otherwise.

"It is further agreed that his agreement may be incorporated in any decree of divorce obtained by either party hereto.

"In Witness Whereof, the parties hereto have executed the foregoing agreement the day and year first above written."

Mary Xavier returned to this country and obtained a divorce on August 4, 1933. It appears that Xavier fell behind in the monthly payments due under the above property settlement and Mary went back to Shanghai in an endeavor to straighten out these matters. From her testimony and certain of the exhibits before me it appears that these arrears amounted to $1,800 and that on September 28, 1935, she received from her former husband the sum of $1,000, leaving a balance past due of $800. According to her testimony it was agreed that this balance should be paid off at the rate of $25 a month, but that the regular monthly payments should be reduced to $125 per month. An additional change was that instead of the money being sent direct by Xavier, he was to cause the monthly payments to be made to Mary by the New York Office of The Texas Company. These agreements were reduced to writing and signed by the parties. The amendatory agreement dated September 28, 1935, was as follows:

"Agreement made at Shanghai, China, this 28th day of September, 1935, between Norman Frederick Xavier (hereinafter referred to as the 'First Party') and Mary Mercer Xavier (hereinafter referred to as the 'Second Party').

"Witnesseth:

"Whereas on the second day of November, 1932, the First Party and the Second Party (then being husband and wife but now being divorced) entered into a certain property settlement agreement at Shanghai, China, which provides, among other things, that the First Party shall pay to the Second Party the sum of One Hundred Fifty Dollars United States currency (US $150.00) on the first day of December, 1932, and a like sum on the first day of each and every month thereafter for her maintenance and support; and

"Whereas the First Party has requested the Second Party to amend the last aforesaid agreement in the manner hereinafter provided and the Second Party is willing to agree to such amendment:

"Now, therefore, it is hereby mutually agreed as follows:

"1. The First Party will continue to make the aforesaid payments of One Hundred Fifty Dollars United States currency (US $150.00) monthly to the Second Party until the end of August 1936, it being understood, however, that thereafter the monthly payments shall be reduced to One Hundred Twenty-five Dollars United States currency (US $125.00), payable on the first day of September 1936, and on the first day of each and every month thereafter.

"2. It is agreed and understood by the parties hereto that the First Party will cause the monthly payments provided for in Paragraph 1 hereof to be paid directly to the Second Party by the New York office of the Texas Company (China) Ltd. so long as the First Party is employed by the Texas Company (China) Ltd. Should the First Party cease to be employed by The Texas Company (China) Ltd., the payments provided for herein will be made by him directly to the Second Party.

"3. In the event that the First Party shall be in arrears for a period of one month in making any payment provided for herein, it is understood and agreed that the Second Party shall then have the right to demand and receive One Hundred Fifty Dollars United States currency (US § 150.-00) monthly instead of the reduced sum of One Hundred Twenty-five Dollars United States currency (US $125.00) monthly provided for herein.

"4. Except as amended by this present agreement, the aforesaid agreement between the parties hereto dated November 2, 1932, shall be and remain in full force and effect.

"In Witness Whereof the parties hereto have executed this agreement in duplicate at the place and time first above mentioned."

Mrs. Mary Xavier in her testimony stated that the reasons for this change were, first, that she realized that her former hus-

band was rather hard pressed financially and was having difficulty in keeping up with his payments as he had to contribute to the support of some members of his family; and that a second and very important reason was that the payments would come directly from The Texas Company in this country and she would not have to be dependent upon his sending them and she thereby obtained greater assurance of prompt payment.

It appears that Xavier had also taken advantage of a Death and Disability insurance plan, which had been put into effect by The Texas Company, and that the beneficiary originally named was his wife, Mary, but after his divorce and his marriage to Ella he caused a change to be made in that so that the latter was named as beneficiary. Xavier died on May 18, 1938, leaving in full force and effect a will dated July 30, 1934, wherein after directions for payment of debts and expenses he provided as follows:

"I bequeath to my beloved wife, Ella B. Xavier, all the residue of my estate, which is to include my Texas Company's Death and Desibility Benefit as Well as my Life Insurance with the West Coast Life Insurance Co. By all of the residue of my estate, I mean of every kind and description both real and personal, wherever located now, or hereafter owned by me at the time of my death."

No executor having been named in the will, his widow, Ella, applied for and was appointed administratrix ad colligendum.

It seems that in the settlement of the affairs of Xavier, his widow and administratrix took up with the Texas Company the matter of his rights under these stock subscriptions. The Company found itself faced with the situation where it was uncertain how to act. The beneficiary named in certain of the subscriptions was the former wife, Mary, and on the other hand it was aware of the property settlement and the will. A document purporting to be a release by Mary was filed. This is a certificate dated April 24, 1940, reciting the property settlement hereinabove referred to and releasing the estate of Xavier from all rights or claims in connection with any rights or claims in the Superannuation Fund of The Texas Company, the Death and Disability Plan, or Stock Investment Plan, in which Xavier may have been participating or interested, and directing that all benefits be paid to his estate. This document is executed as follows:

"Mary Mercer Xavier
"By Harris G. Nelson
"Her Attorney in Fact"

Attached to this is an affidavit taken before the United States Consul at Shanghai wherein Harris G. Nelson avers that he is familiar with the contents of the certificate and is duly authorized as the attorney in fact of Mary Mercer Xavier to execute the same. At the trial no proof was offered to show that a power of attorney had ever been given by Mary Xavier to Nelson, and Mary Xavier in her testimony stated that she had never given a power of attorney to this party and in fact, did not know him. I am, therefore, constrained to hold that this certificate and alleged release are without any effect whatsoever and may be entirely disregarded in this case.

It appears that subsequently The Texas Company communicated with Mary requesting her to execute a release so that it could pay the money to the widow and estate. This she refused to do and on advice of counsel brought an action in the Court of Common Pleas for Charleston County. The Company being thus faced with a claim by the widow and administratrix and a claim (in which suit had been commenced) by the divorced wife, took advantage of the federal statute and this suit was instituted and an interlocutory injunction was issued restraining all parties from taking any action in the matter except in this case. Most cases of this kind are in regard to cash money or particular personal property which can be paid to, or turned into the custody of, the court. Here, however, there is an option as to the method of settlement and whichever party is found to be entitled to these rights may have the choice of paying to the Company the balance due on the stock subscriptions and obtaining the stock, or else of receiving a refund of the amount paid with interest. Under these circumstances it was impossible for the Company to either file the stock certificates or put up the cash funds in its hands, so with the permission of the court it has filed a bond in the sum of $5,000.00 as a guarantee to carry out the directions of the court and to issue the stock or pay the money at such time as the option may be exercised by the party who is entitled to the same according to the adjudication to be made by this court. Under these circumstances I am of the opinion that the

Company has done all that it can and it is entitled to be paid its costs and expenses including a reasonable attorney's fee to be hereafter fixed, and in due time and upon compliance with the decree of this court and the option of the party entitled to exercise same, it and its bond will be discharged.

It will thus be seen that the matter is one of dispute as to which of the two parties defendant, Mary or Ella, is entitled to the rights in the stock subscription plan. Counsel for the claimant, Mary, argues that the court is bound to construe the subscription application literally and that the named beneficiary never having been changed she is entitled to receive the benefits from such subscriptions. On the other hand, the widow's claim is that the property settlement as represented by the original document (including the amendment thereto), severs all rights or claims between the parties and this, as well as the Will, indicates the intention of Xavier to divest himself of all obligations to his former wife, and that although the named beneficiary was not changed this probably was a mere oversight on the part of Xavier, and as a matter of fact, it was not at all necessary since the property settlement indicated a complete severance of relations and renunciation and release of all property rights by Mary.

Counsel for the widow, Ella, make a further differentiation as to the ten shares subscribed for in 1937 by the Trustee, in which there was no specific designation of a beneficiary. It is apparent that the other sixty two shares had Mary as their beneficiary since although some of them did not have her name actually therein written, nevertheless, the designation in the later ones included all prior allotments. We, therefore, may consider that sixty two shares were allotted to her as beneficiary in the event of Xavier's death. The argument is made that there is a difference between these sixty two shares and the ten shares subsequently subscribed for by the Trustee. If we are to be governed by what is actually written in the allotment subscription this argument may be valid, and if I should hold that the sixty two shares which contained a beneficiary allotment to Mary should be decreed as going to her, then I think under the same rule of construction the ten shares that never had any distinct designation would be held as undesignated and, therefore, going to the es-

tate, and that Ella as the administratrix would be entitled to the rights therein. However, as I do not agree to this construction of the documents and facts, I think it unnecessary to differentiate between the ten shares and the sixty two shares and am of the opinion that the interests in the rights of the entire seventy two shares are the property of the estate and that Ella as administratrix, is entitled to all rights under the subscription plan and has the option of paying the balance and obtaining the shares, or else of obtaining the amounts heretofore paid in with interest, in accordance with the details set forth in the plan under which the subscriptions were made.

A number of cases and authorities have been cited to me in regard to this matter. I have not found any case under exactly the same state of facts or where such a similar condition has arisen. The attorneys on both sides have cited many cases and authorities in connection with life insurance policies. It seems to be generally accepted that where, in a life insurance policy, there is a named beneficiary there is a great difference between the rights of such beneficiary whether or not there is a clause giving the insured the right to change such beneficiary. If there be no power of revocation the beneficiary takes a vested interest, but if there be power of revocation the beneficiary takes no vested interest, but only an expectancy. This matter has been discussed in many cases in this and other jurisdictions. In South Carolina the rule at one time was otherwise and any named beneficiary was considered to have a vested interest. However, the South Carolina Supreme Court has later changed that doctrine, such a statement first appearing in the case of Bost v. Volunteer State Life Ins. Co., 114 S.C. 405, 103 S.E. 771. The conflict between that case and former cases was fully pointed out and discussed in Antley v. New York Life Ins. Co., 139 S.C. 23, 137 S.E. 199, 60 A.L.R. 184, where in an elaborate opinion by Mr. Justice Cothran the doctrine of the Bost case was adopted and the earlier cases overruled. The court has followed this ruling in a number of cases since. See Wannamaker v. Stroman, 167 S.C. 484, 166 S.E. 621; Davis v. Acacia Mut. Life Ins. Co., 177 S.C. 321, 181 S.E. 12; Shuler v. Equitable Life Assur. Soc., 184 S.C. 485, 193 S.E. 46; Wilkie v. Philadelphia Life Ins. Co., 187 S.C. 382, 197 S.E. 375.

In most of the cases cited to me the question at issue was as to whether the insured had taken proper steps to make a change in the beneficiary. In certain of the cases (for instance in the Wilkie case), the court points out that the insured had ample opportunity to effect the change of beneficiary in the method prescribed by the policy itself, and having failed to do so the court of equity did not consider that the change had been made. On the other hand, in certain instances the court has made the change where the facts were such that it appeared that the clear intention of the insured was to make the change. See Hunter v. Hunter, 100 S.C. 517, 84 S.E. 180.

In the instant case it is true that there was a method prescribed for the change of beneficiary, which method was not followed strictly. However, if it was known definitely that the intent of Xavier was to make a change the court should follow and carry through this intent. In the cases where the courts refused to do this it was because such intent was not positively proven and some steps which had not been taken indicated that the matter was not definitely decided upon. By his will Xavier indicated his intent to leave everything that he had to his then living wife, Ella Xavier, and by the separation agreement he indicated that he was closing out all relations, marital as well as financial, with the claimant, Mary Xavier. At the time of this settlement he was married to her, but the separation is very clear and distinct as evincing an intent on the part of both of them to end all obligations of any kind, the one to the other. This was entered into shortly before a divorce was obtained. Mrs. Mary Xavier then obtained the divorce and within a few months thereafter Xavier married the defendant, Ella Xavier, and thereafter died. It is true that the stock purchase arrangements were not mentioned in the separation agreement nor in the will. It has been argued that this shows an intent to leave them in the condition in which they then were. A more forceful argument, however, is that Xavier in making this separation agreement and financial settlement really believed that he had ended for all time all financial obligation to his wife save the money installment plan (really alimony), which he agreed to have made to her. In the execution of the property settlement agreement there was no reservation in his mind, and what is more important, there certainly was no reservation in her mind. This is proven by the separation agreement itself, since neither of them named or referred to the stock subscription and it is confirmed by the testimony of Mary Xavier taken before me at the time of the trial wherein she says that while she knew her former husband had the right to acquire stock under the plan she did not know anything about the beneficial interest and had no knowledge that she had any interest or claim in the matter until she received a communication through the attorney for The Texas Company. That the separation agreement was intended as a complete severance of all relations between the parties is clear and unequivocal. It appears to me to have intended to convey to each other any right, title or interest, of any kind, that one might have had in the other party's property, not only vested, but contingent or in expectancy. From the affidavit of Richard L. Saunders, to which is attached a financial statement, it appears that no salary deductions or payments were made by Xavier on account of this stock purchase until 1933, the first such payment being in June of that year. This was some time after the execution of the property settlement (November 2, 1932), and but two months prior to the divorce obtained by Mary in this country. It is significant that all of the contributions by Xavier to the fund were subsequent to his separation from, and settlement with, his former wife.

The doctrine of many of the cases submitted to me is that the true intent should govern and that where the insured has failed to take the proper steps to make a change of beneficiary of life insurance it might be considered that the intent is not proven and that he may have a reservation of intent to make a change. In the instant case, however, everything points to the intention of Xavier to have the benefit of his stock subscription go to his wife, Ella Xavier. He made a separation agreement with his then wife, Mary; they were divorced and in a short time he married the defendant, Ella Xavier; an amended or supplementary agreement was entered into between Xavier and his former wife, Mary after she had gone half way around the world and then there was no discussion relative to the stock; she had no knowledge or expectation of any interest in the stock and assumed that she would never benefit by it; Xavier died and by his will left his property to his wife, Ella. To my mind it is clear that he intended that the benefits

of the stock accumulation should go to his wife, Ella, and thought that he had done what was necessary to this end, and that his former wife, Mary, intended to divest herself of any claims against him or his estate excepting the alimony provided by the separation agreement.

To the foregoing reasons may be added the common sense reason that a man would have intended to have made provision for and given what he had to the wife with whom he was living at the time of his death rather than to the one from whom he was separated and divorced "as a result of disputes, differences and disagreements", and with whom he desired "to forever settle * * * all other property rights."

Mary Xavier made her settlement and obtained her divorce. She renounced all claims against her former husband's property. And she is not now entitled to recover on this claim because having by her own act caused Xavier to believe that she had no further claim to anything of his she should not now benefit by his failure to make a change of beneficiary, which she had rendered unnecessary.

I am of the opinion that the claim of Mary Mercer Xavier should be denied and that Ella B. Xavier, as administratrix ad colligendum of the estate of Norman F. Xavier, should be awarded all of the rights, including the option to choose between the methods of settlement, which her late husband, Norman F. Xavier, had acquired by and through the various stock plan allotments hereinabove recited.

The foregoing opinion substantially sets out the facts as found, but because of there being various allotments of stock at different times it is probably necessary for complete compliance with Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, to file separate formal Findings of Fact and Conclusions of Law. The attorneys for the prevailing party will, therefore, prepare and present upon five days notice proposed Findings of Fact and Conclusions of Law and also a proposed order, which order shall give unto the prevailing party the option of exercising one of the respective plans of settlement as set forth in the pleadings, a reasonable time limit to be embodied within which to notify the plaintiff of her decision and election, and upon failure of such notification within the time limit, the plaintiff, The Texas Company, may have the right to pay into the court a sum of money equal to the amount heretofore paid on the stock allotments with interest as provided by the plan.

 Such order will also provide for the payment to The Texas Company of its costs, together with a reasonable attorney's fee for plaintiff's attorney, which will be fixed by this court at the time that the order is presented for signature; at which time all parties shall have an opportunity to be heard as to the amount of such attorney's fees and also as to the form of the order.